AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of South Dakota

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

USA v. 23-173-05

)
)
)
)
)
)
)

Case No.    5:23-mj-179

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE "ATTACHMENT A", which is attached to and incorporated in this Application and Affidavit.

located in the _____ District of _____ South Dakota _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE "ATTACHMENT B", which is attached to and incorporated in this Application and Affidavit.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1153 and 1111 | First Degree Murder |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Brent Bixenman, FBI SA
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    08/30/2023

_____
*Judge's signature*

City and state:  Rapid City, SD

Daneta Wollmann, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| IN THE SEARCH OF: | CASE NUMBER: 5:23-mj-179 |
| USA v. 23-173-05 | **SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION** |

State of South Dakota  )
                ) ss
County of Pennington  )

I, Brent Bixenman, a Special Agent with the Federal Bureau of Investigation ("FBI"), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the FBI and have been so employed since March 2018. I am currently assigned to the Rapid City Resident Agency, Rapid City, SD, and am charged with investigating violations of federal law. My responsibilities include the investigation of possible violations of federal law, to include carjacking, firearms offenses, and other violent crime violations. During my career, my investigations have included the use of various surveillance techniques and the execution of various search, seizure, and arrest warrants.

2. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant to Apple and does not set forth all of my knowledge about this matter.

3.      Your affiant is requesting a search and seizure warrant authorizing the search and seizure of information associated with a certain Apple ID that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA.   The information to be searched is described in the following paragraphs and in Attachments A and B.

4.      This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Apple to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user IDs.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that evidence of violations of 18 U.S.C. §§ 1153 and 1111, are present in Apple ID account.   There is also probable cause to search the information described in Attachment A for evidence, contraband, or fruits of these crimes, as further described in Attachment B.

### PROBABLE CAUSE

6.      Your affiant learned from a review of the Oglala Sioux Tribe Department of Public Safety (OSTDPS) dispatch log that on May 19, 2023, at approximately 11:43 AM, a female caller reported that an ambulance was needed to help with her father, Patrick Carlow.   The female advised that her father, 73 year old Patrick Carlow, was passed out and not waking up.

2

7.  Your affiant learned from a review of dispatch records that OSTDPS Officer Gaylen Twiss arrived on scene and noted a bloody wound to the back of Carlow's head.  Your affiant also learned from a review of dispatch notes that Officer Twiss found two .22 caliber cartridge casings on the floor.

8.  Your affiant learned that FBI SA Matt Weber arrived at the residence shortly after learning of the call.  Your affiant learned that SA Weber observed Carlow deceased on his bed inside his bedroom of the house.  Your affiant learned that SA Weber observed several alcohol cans as well as several boxes of unconsumed alcohol cans inside the bedroom in which Carlow was found.

9.  Your affiant learned that SA Weber observed a bloody injury/wound to the back of Carlow's head.

10.  Your affiant learned from a review of the dispatch log that two juvenile females were interviewed by Officer Twiss, C.R. and K.M.C.  From a review of Officer Twiss' report, it appears he may have interviewed both juveniles together.  The juveniles are approximately 11 and 9 years old respectively. Based on your affiant's investigation, the juveniles are close relatives and/or family friends of Carlow and were staying with Carlow on the evening/morning he was murdered.  The juvenile females told Officer Twiss that they last spoke to Carlow at midnight, that they could hear him coughing at approximately 5:00 AM on May 19, 2023.  The juveniles stated that they went to wake him up that morning (presumably after 5:00 AM), but that he would not get up.  The

3

juveniles then called C.R.'s father, Clarence Rouillard, and told him that Carlow would not wake.

11.    Your affiant learned that after C.R. called Rouillard, that Rouillard responded.   Your affiant learned that when Rouillard could not find a pulse, that help was requested.

12.    Your affiant learned that on May 23, 2023, Forensic Pathologist Doctor Donald Habbe performed an autopsy on Carlow.   Dr. Habbe determined that the cause of death was from two contact shots to the back of Carlow's head.

13.    Two bullets were collected from Dr. Habbe.   The ammunition appears to be consistent with .22 caliber ammunition.

14.    Your affiant learned that SA Weber interviewed Rouillard on May 23, 2023.   Rouillard said that he spoke to his daughter, C.R., on the evening of May 18, 2023, at approximately 8:30 PM.   C.R. told Rouillard that everything was fine and that they, she and K.M.C., were getting ready to go to bed.   Your affiant learned that the following morning, May 19, 2023, his daughter, C.R., called him again at approximately 8:30 AM and advised him that Carlow was not yet awake.

15.    Your affiant also learned that SA Weber interviewed Leonard Two Bulls on May 23, 2023.   Two Bulls told SA Weber that on May 18, 2023, C.R. and K.M.C. were present at Carlow's house on the afternoon of May 18, 2023, and that Two Bulls left the Carlow residence at approximately 4:30 PM.   Your affiant learned that Two Bulls told SA Weber that Carlow did not let anyone his bedroom.   Your affiant learned that Two Bulls told SA Weber that Carlow had

4

two other men at his house, however, Two Bulls did not specify who the men were and when they were present. Your affiant learned that the two males have not been identified.

16. On May 23, 2023, your affiant learned from SA Weber that Lisa Carlow, the oldest daughter of the deceased, told him (SA Weber) that on the evening of May 19, 2023, a firearm owned by the deceased, was determined to be missing. The firearm is a .22 caliber, Classic Rimfire firearm.

17. Lisa told SA Weber that Carlow typically got up around 6-7:00 AM and called his ranch hands to find out who will be helping him for the day. Lisa learned of Carlow's passing from Vanna, who is K.M.C.'s mother (the juvenile female that was present in the home on the evening/morning of the murder).

18. Your affiant learned that K.M.C. called Vanna at approximately 11:30 AM and that thereafter Vanna called Lisa and Patrick's youngest daughter, Patricia Carlow.

19. Your affiant learned from SA Weber that Lisa told him (SA Weber) that since Carlow's passing, Patricia has insisted that everything (in the home or that was Carlow's), is now Patricia's. Your affiant learned that since Carlow's passing, Patricia has inquired about how much money Carlow had in his bank account.

20. Your affiant learned from SA Weber that Lisa told him that Patricia is in a relationship with Sage Flye and that Patricia has used meth.

5

21.    Your affiant learned that SA Weber interviewed Patricia Carlow on June 15, 2023.

22.    Patricia told SA Weber that she returned from Lincoln and Omaha, Nebraska, on Wednesday, May 17, 2023.

23.    Patricia said that when she arrived home, Carlow was asleep in his chair and that she startled him when she walked in.  Patricia told SA Weber that Carlow always locks the doors at night, but that she has a key to the house.

24.    Patricia said that the last time she saw her father was between 10-midnight on the evening of May 17.

25.    Patricia told SA Weber that after she saw her father on May 17, 2023, she went to her sister-Vanna's residence in Rapid City.  Patricia told SA Weber that the morning of May 18, 2023, her employer told her that she didn't have to go to work but that she went into work anyway.  Patricia said that halfway through the day on Thursday, May 18, 2023, she left work and that she worked approximately 4-5 hours.  Patricia told SA Weber that after working 4-5 hours on May 18, 2023, she returned to Vanna's, ate supper and then went back to sleep.

26.    Patricia told SA Weber that on Friday, May 19, 2023, she woke up and went to work until she was called by her sister Vanna and learned of Carlow's passing.  Patricia told SA Weber that she stopped at the Yesway on Cambell St. and then headed straight to Carlow's residence.

6

27.     Patricia told SA Weber that she does not know the combination to the gun safe, but that Lisa would know as Lisa had already taken a bunch of property from Carlow's residence.

28.     In summary, Patricia told SA Weber that the last time she saw Carlow was on late Wednesday evening, May 17, 2023.  Patricia said that after visiting with her dad, Carlow, she got into her car and drove to her sister's residence in Rapid City, where she got something to eat and then went to bed.

29.     Patricia told SA Weber that on Thursday, May 18, 2023, she worked for 4-5 hours at the Country Inn & Suites and that it was really busy at the hotel.

30.     Your affiant learned that Krista Espinosa (General Manager) worked at Country Inn & Suites.  Your affiant learned that Espinosa said that Patricia clocked in at 2:28 PM and clocked out at 3:15 PM on May 18, 2023.  This was approximately 45 minutes.  Your affiant learned that Patricia was a "no show" from May 19, 2023, until June 5, 2023, and that she was thereafter terminated from her employment.

31.     Your affiant learned that Patricia was not on time for work (on May 18) as housekeepers typically clean during the mornings and are finished by 3-4 PM.

32.     Patricia also told SA Weber that no one is allowed in her bedroom at Carlow's residence.

33.    Your affiant learned that SA Weber interviewed Vanna Bear Saves Life on June 21, 2023.  Vanna's mother was in a relationship with Carlow. Patricia and Vanna are half-sisters and shared the same mother.

34.    Your affiant learned that SA Weber asked Vanna about Patricia's location on the days leading up to the homicide.  Vanna told SA Weber that Patricia stayed with Vanna at her apartment in Rapid City since most of last summer.  Vanna told SA Weber that Patricia went to work on Thursday and came home in the afternoon.  Vanna said that at approximately 6-7:00 PM, Patricia and Sage left her apartment and that she is not sure whether or not Patricia and Sage returned that evening.  Vanna stated that Patricia went to work the following day, May 19, 2023.  Vanna said that on the morning of May 19, 2023, at approximately 11:30 AM, she received a call from her daughter, K.M.C. and learned that Carlow was not waking up.  Vanna told SA Weber that she called Patricia and Ola Featherman about Carlow.

35.    Vanna told SA Weber that K.M.C. told her (Vanna) that she (K.M.C.) and C.R. stayed up real late.  Vanna also told SA Weber that when K.M.C. stays there, she either stays and/or plays in the living room or in Patricia's room.

36.    Your affiant learned that SA Weber subpoenaed Patricia's Facebook subscriber information.  The subscriber information provided log-in and log-out information for Patricia's account.  A review of log-in and log-out revealed the following:

(previously logged-in session)

8

Patricia logged-out of Facebook on May 18, 2023, at 11:12 PM

Patricia logged-into Facebook on May 18, 2023, at 11:14 PM

Patricia logged-into Facebook on May 19, 2023, at 5:39 AM

Patricia logged-out of Facebook on May 19, 2023, at 6:06 AM

Patricia logged-into Facebook on May 19, 2023, at 9:09 AM

37.    Your affiant is aware that Patricia was connected to IP addresses during the times she was logged into/out of Facebook and that she likely was connected to the Internet using her cellular phone.

38.    Facebook also provided a phone number tied to the account.  The phone number used to "verify" the account is 605-970-5554.  The phone number was confirmed on June 23, 2023, as the verified phone attached to the account. Patricia also confirmed the phone number above as the phone number she uses.

39.    On June 30, 2023, your affiant learned that SA Weber received results from a subpoena regarding three particular IP addresses that were related to a physical location.  The results of the subpoena from Midcontinent showed that on May 17, 2023, at approximately 10:55 PM Patricia was at Vanna's residence and logged into Facebook.  Between approximately 11:14 PM on May 18, 2023, and 6:05 AM on May 19, 2023, Patricia was using cellular data connected to a cell tower.  At 6:06 AM, on May 19, 2023, records indicate Patricia is at a similar IP address (with initial 4 characters) associated with Vanna's IP address.  Based on information received from Midcontinent, your

9

affiant believes that the IP address indicated on Patricia's Facebook account is associated with Vanna's IP address.

40.    On July 18, 2023, your affiant learned that SA Weber received information from the FBI's Cellular Analysis Survey Team (CAST) regarding an analysis of Patricia's cellular phone activity.   Preliminary records indicate that Patricia's phone was off between approximately 6:00 AM and 9:20 AM on the morning of May 19, 2023.

41.    Your affiant is aware that the first call into law enforcement regarding Carlow's death was made at approximately 11:43 AM, and that the girls heard Carlow coughing at approximately 5:00 AM.   Thus, your affiant believes that the homicide could have occurred at some time after 5:00 AM and before 11:43 AM.

42.    Your affiant also reviewed frequency phone data from CAST.   Your affiant learned that Patricia had approximately 3,500 connections with apple.com, 1,920 connections with Life360, 1,890 with Facebook, and 1,100 connections with a site called launchdarkly.com during the time period from May 18, 2023, until May 20, 2023.

43.    Your affiant also learned from CAST that on the morning of May 19, 2023, between 1:00 AM and 1:57 AM, Patricia's phone was actively pinging off of AT&T towers in and around Rapid City and messaged number 605-209-0276. Your affiant also learned that between 3:01 AM and 3:12 AM on May 19, 2023, there were multiple calls and messages to the same number that contained no

10

cell site data.  This could indicate that the phone was off or in airplane mode. 605-209-0276 belongs to Vanna.  Your affiant is aware that SA Weber collected Vanna's cellular phone and did a consensual search of her (Vanna's) phone. Your affiant observed a message sent by Vanna to Patricia on the morning of May 19, 2023 regarding the purchase of blueberry teas.

44.    Between approximately 5:00 AM and 5:37 AM on May 19, 2023, Patricia's phone began pinging off cellular towers in Rapid City.  Shortly after Patricia's phone was in Rapid City, all cellular history goes dark, until a series of calls were received from 605-415-1503 at 9:21:56 AM, 9:24:54 AM and 9:24:56 AM.  It appears that the first two calls were less than one second long and that the third call, at 9:24:56 AM was three seconds long.  605-415-1503 belongs to Patricia's employer/supervisor at the hotel, Tea Escobar.  Tea Escobar has not been interviewed.

45.    Your affiant also noted that Patricia called Lisa Carlow, the deceased's oldest daughter at 9:41 AM on May 19, 2023, but the call was less than one second long, or did not go through.

46.    Your affiant also noted approximately 24 text messages were exchanged between Patricia and 605-407-7192.  This number belongs to Crystal Stands.

47.    Your affiant learned that at some point after the homicide, SA Weber seized Carlow's IPhone.  An extraction was performed of the phone.  Your affiant discovered that on May 19, 2023, at 11:40 AM, Patricia texted Carlow,

11

"Answer me." Your affiant noted that when the cell phone extraction was performed, this message was deleted.

48.    Your affiant also noted that someone, unknown, but presumably Patricia and her boyfriend, were using Carlow's phone. On May 20, 2023, an unknown individual accessed Carlow's phone and sent a link to Patricia's icloud account. Specifically, the individual was using Patricia's icloud account as a backup to Carlow's cellular phone. On May 20, 2023, at 10:15 PM, an unknown individual accessing Carlow's phone sent the following message to Patricia's icloud account:

> I'd like to add you as my recovery contact. If you accept, you'll be able to help me recover my data and regain access to my account. I will call you or reach out in person when I need help.

49.    On May 21, 2023, at 5:41 PM, Patricia's icloud account messaged Carlow's phone, "Keep up" and "Tell K[M.C.] to call Dee and see if she's home[.]"

50.    Additionally, file 0796.MOV was deleted from Carlow's phone. Your affiant has not been able to locate this file.

51.    On May 23, 2023, at 12:11 PM, Patricia's icloud account messaged Carlow's phone, "Start logging out cuz they might take his phone[.]"

52.    It is important to note that all of these messages, and other information was found in the "trash" portion of the cell phone extraction. Meaning, someone intentionally deleted the information.

12

53.    Patricia's icloud account is patriciawild17@icloud.com.    Your affiant is requesting a search and seizure warrant for activity on her icloud account.

54.    On or about June 30, 2023, your affiant learned that Patricia was arrested at Carlow's residence and was in possession of glass pipes, a black digital scale, and jewelers bags.    Your affiant learned that all of these items tested presumptively positive for meth.    Your affiant learned that after Patricia was arrested additional items were collected by Lisa Carlow and turned over to law enforcement with OSTDPS.    The items included additional paraphernalia, jewelers bags, syringes, as well as a white liquid substance in one of the bags.

55.    Your affiant learned that Patricia denied selling methamphetamine but admitted to supplying syringes to users.    Your affiant learned that Patricia's cellular phone was seized pursuant to the drug investigation.    Your affiant learned that this information was passed onto Special Agent Healy with the FBI drug task force.

56.    On August 3, 2023, your affiant learned that SA Weber reinterviewed Patricia.    Patricia said that she was not entirely honest during her first interview.    Patricia advised that on the evening of May 18, 2023, she went to Crystal Stand's residence before she picked up Sage from Wendy's.    Patricia admitted to going to a friend's house to acquire some methamphetamine, but would not indicate, or could not remember, who her provider was.

57.  On August 16, 2023, your affiant learned that SA Weber reinterviewed Clarence Rouillard.  Rouillard advised SA Weber that his daughter, C.R., told him that on the evening of May 18, 2023, Carlow went to bed early because Carlow and Patricia got into a fight.  Your affiant learned that Rouillard told SA Weber that either C.R. or K.M.C. lent Carlow a phone so that he could call Patricia back.  Your affiant learned that the girls learned from Carlow that Patricia had blocked Carlow's phone number from receiving calls.  Your affiant is aware that Apple can provide a list of blocked numbers, as well as information sent and received over Apple devices.

58.  Your affiant learned that the location is within the exterior boundaries of the Pine Ridge Reservation and that Carlow was an enrolled or enrollable member of the Oglala Sioux Tribe.

59.  Your affiant believes that whoever killed Carlow knew that he had a firearm and knew that he would be sleeping on the evening/morning of May 19, 2023, and that the shooter entered or was already inside the residence when the shooter killed Carlow.

**INFORMATION REGARDING APPLE ID AND iCLOUD**[1]

---

[1]  The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud:

60.    Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

61.    Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").    As described in further detail below, the services include email, instant messaging, and file storage:

a.    Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.    iMessage and FaceTime allow users of Apple devices to communicate in real-time.    iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.    iCloud is a file hosting, storage, and sharing service provided by Apple.    iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d.    iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via

How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

15

icloud.com on any Internet-connected device.   For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents.   iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.   iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.   iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f. Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and

16

wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

62. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

63. An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or

17

@mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

64. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

65. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple

services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

66. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

19

67. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

68. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and

20

prove each element or, alternatively, to exclude the innocent from further suspicion.

69. Your affiant is aware that Patricia utilized the Apple ICloud to make her icloud account the recovery account for Carlow's phone. Your affiant knows from his training and experience that an email account is all that is needed in order to create an Apple ICloud account.

70. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

71. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

72. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content

21

of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

73. Based on the forgoing, I request that the Court issue the proposed search warrant.

74. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

75. The government will execute this warrant by serving the warrant on Apple. Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

_____
Brent Bixenman, Special Agent
Federal Bureau of Investigation


SUBSCRIBED and SWORN to
____x in my presence
_____ by reliable electronic means

this 30th day of August, 2023.

_____
DANETA WOLLMANN
U.S. MAGISTRATE JUDGE

22

5:23-mj-179

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the following Apple ICloud user IDs that are stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA:

- User Name:   patriciawild17@icloud.com

5:23-mj-179

## **ATTACHMENT B**
## **Particular Things to be Seized**

### I.    **Information to be disclosed by Apple**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)   All stored communications and other files in your possession (to include, if available, account access information, event histories including dates and times, connection dates, times and locations, connection IP information, message content, graphics files, attachments, etc., further detailed below), whether physical, stored on electronic media, or temporarily extant on any computer or server, reflecting communications to or from Apple Account patriciawild17@icloud.com.

(b)   All files that have been created and/or accessed via Apple Account patriciawild17@icloud.com.

(c)   The identifiers and all available information for any other email account(s) associated with Apple Account patriciawild17@icloud.com.

(d)   All connection logs and records of user message activity, including;

   1)   Transmitter/Sender identifier (i.e. addresses and/or IP address);

   2)   Connection date and time;

3) Method of connection (telnet, ftp, http);

4) Data transfer volume;

5) User name associated with the connection and other connection information, including the Internet Protocol address of the source of the connection;

6) Other user accounts associated with, referenced in or accessed by Apple Account patriciawild17@icloud.com.

7) Address books, contact lists and "my friends," if available;

8) Records of files or system attributes accessed, modified, or added by the user.

(e) All records and other evidence relating to the subscriber(s), customer(s), account holder(s), or other entity(ies) associated with Apple Account patriciawild17@icloud.com, including, without limitation, subscriber names, user names, screen names or other identities, addresses, residential addresses, business addresses, and other contact information, telephone numbers or other subscriber number or identifier number, billing records, information about the length of service and the types of services the subscriber or customer utilized, and any other identifying information, whether such records or other evidence are in electronic or other form. Such records and other evidence include, without limitation, correspondence and other records of contact by any person or entity about the above-referenced account, the content associated with or relating to postings, communications and any other

2

activities to or through Apple Account patriciawild17@icloud.com whether such records or other evidence are in electronic or other form.

(f) All records pertaining to communications between Apple and any person regarding the user or the user's Apple account, including contacts with support services and records of actions taken.

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§1153 and 1111, First Degree Murder, from May 1, 2023, to present, including, for each user IDs identified on Attachment A.

## III.    Information Regarding Search Warrant Compliance by Apple:

Apple shall disclose responsive data, if any, by sending to:

> Special Agent Brent Bixenman
> Federal Bureau of Investigation
> Rapid City, SD   57701
> (605) 295-4861

Apple shall use the United States Postal Service or another courier service to disclose the responsive data, notwithstanding 18 U.S.C. § 2252A or similar statute or code.

3

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of South Dakota

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>USA v. 23-173-05 | )<br>)<br>)   Case No.   5:23-mj-179<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____ South Dakota _____
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A, attached hereto and incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Evidence of a crime of First Degree Murder, in violation of 18 U.S.C. §§ 1153 and 1111, as described in ATTACHMENT B, attached hereto and incorporated by reference.

I find that the affidavit, or any recorded testimony, establishes probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____September 13, 2023_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Daneta Wollmann_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   08/30/2023 8:30 am   _____
*Judge's signature*

City and state:   Rapid City, SD   _____
Daneta Wollmann, U.S. Magistrate Judge
*Printed name and title*

cc: AUSA Megan Poppen via email
kle

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>5:23-mj-179 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*